# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 04-2170

BRENT DARNELL,

*Plaintiff-Appellant*,

v.

THERMAFIBER, INCORPORATED,

*Defendant-Appellee.*

———————

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 02 C 663—**Robert L. Miller, Jr.**, *Chief Judge.*

———————

ARGUED DECEMBER 9, 2004—DECIDED JULY 29, 2005

———————

Before FLAUM, *Chief Judge*, and BAUER and WILLIAMS, *Circuit Judges*.

BAUER, *Circuit Judge*. Plaintiff-Appellant Brent Darnell sued defendant-appellee Thermafiber, Inc., alleging discrimination in violation of Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq. The district court granted Thermafiber's motion for summary judgment. We affirm.

## I. Background

Thermafiber manufactures mineral wool insulation at its plant in Wabash, Indiana. This process involves melting rock and blast furnace slag in a furnace at temperatures of over 2,600 degrees Fahrenheit. Upon leaving the furnace, the molten material drops onto fast-rotating wheels where it is cooled and spun to create rock fibers. These fibers are then glued, formed into boards, and cured in ovens at temperatures of 600 degrees Fahrenheit. Once the boards are cooled, they pass through a series of saws and high-speed blades. Operators then retrieve the insulation pieces from the conveyor and lift them onto another conveyor for shrink wrapping.

In late October 2000, Thermafiber hired Darnell through a temporary employment agency. Darnell is a Type I diabetic who is insulin-dependent. Before starting the job, Darnell was required to pass a pre-employment physical. Thermafiber contracts with a Wabash medical practice, Family Physicians Associated, to perform these exams. On October 31, 2000, nurse practitioner Lynn Wicker conducted the physical and reported to Thermafiber that Darnell was capable of performing the requirements of the job. Darnell began work shortly thereafter.

In early May 2001, Darnell left Thermafiber to work outside the state. Up until that time, he did not have any debilitating episodes at Thermafiber related to his diabetes. He returned to Indiana several months later and applied for a full-time position with Thermafiber in August 2001. He was offered a position contingent upon his passing another pre-employment physical. On August 9, 2001, Darnell returned to Family Physicians Associated, where Dr. James McCann conducted the physical. His exam consisted of a urine glucose test and interview. Dr. McCann, whose practice includes 180 diabetes patients, determined from the results of the test and interview that Darnell's diabetes was

not under control; as a result, he felt there was no need to conduct further tests or review Darnell's medical chart. Dr. McCann reported to Thermafiber that Darnell was not capable of performing the physical requirements of the job because of his "uncontrolled diabetes mellitus." Darnell soon thereafter learned from Thermafiber that it was rescinding its offer of employment because he had not passed the physical.

Darnell filed a charge with the Equal Employment Opportunity Commission, claiming he had suffered discrimination in violation of the ADA. The EEOC issued a right to sue letter, and Darnell filed suit in the district court. After discovery, Thermafiber moved for summary judgment, contending that Darnell's uncontrolled diabetes would pose a significant safety risk at the plant. The district court granted the motion.

## II. Discussion

Darnell argues that summary judgment was inappropriate because Thermafiber did not demonstrate that his "uncontrolled" diabetes made him a direct threat to safety at the plant. He also claims that it was unreasonable for Thermafiber to rely upon Dr. McCann's opinion because Dr. McCann failed to perform an adequate, individualized assessment of his ability to perform the job.

We review the district court's grant of summary judgment *de novo. Roger v. Yellow Freight Systems, Inc.*, 21 F.3d 146, 148 (7th Cir. 1994). Summary judgment is appropriate "when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Cameron v. Frances Slocum Bank & Trust Co.*, 824 F.2d 570, 573 (7th Cir. 1987) (citing FED. R. CIV. P. 56(c)). In assessing the matter, we construe all facts and inferences in the light most favorable to Darnell, the non-moving

party. *Webb v. Clyde L. Choate Mental Health & Dev. Ctr.*, 230 F.3d 991, 997 (7th Cir. 2000).

The ADA prohibits an employer from discriminating against a qualified individual with a disability. *See* 42 U.S.C. § 12112(a); *Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662, 669 (7th Cir. 2000). A "qualified individual with a disability" is a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). An individual is not qualified if he presents a "direct threat" to his own health and safety or that of others. *See Bekker*, 229 F.3d at 670. The determination that he poses a direct threat must be premised upon "a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence, and upon an expressly individualized assessment of the individual's present ability to safely perform the essential functions of the job." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 (2002) (citing 29 C.F.R. § 1630.2(r) (internal quotations omitted)). The assessment should take into account: (1) the duration of the risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm. 29 C.F.R. § 1630.2(r); *see also Chevron*, 536 U.S. at 86; *Emerson v. N. States Power Co.*, 256 F.3d 506, 514 (7th Cir. 2001).

## A. Thermafiber Reasonably Relied on Dr. McCann's Opinion

Darnell contends that Dr. McCann failed to perform an individualized assessment of his diabetic condition and abilities that was supported by objective, medical evidence. Rather, he claims the assessment was based on stereotypes and insufficient data—the results of a single urine glucose test—which should have been supplemented by more

reliable blood tests. Therefore, Darnell argues, it was unreasonable of Thermafiber to rely upon Dr. McCann's opinion when it rescinded the offer of employment.

We disagree with Darnell's position. First, his claim that the information he revealed during the interview does not constitute reliable, medical evidence is inaccurate. This court has recognized that testimonial evidence can provide sufficient support for a direct threat finding under the ADA. *See Bekker*, 229 F.3d at 668 (finding that employee and patient reports that a physician smelled of alcohol constituted sufficient evidence that she posed a direct threat to patients); *see also Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1093-94 (5th Cir. 1996) (finding that defendant's testimony confirmed that his diabetes made him a safety risk). During the interview, Dr. McCann asked Darnell about his physical complaints, his health as it related to his diabetes, and whether he experienced episodes of low blood sugar. McCann Dep. at 11. Darnell related a history of poor compliance and failure to seek medical attention; he admitted "his blood sugar levels were too high, he hadn't checked in with a doctor in a number of months . . . [and] last anyone seen it was not good." *Id.* at 32. These admissions were corroborated by the results from his urine glucose test. When Dr. McCann suggested that he better control his diabetes, Darnell angrily responded that his sugar levels were "good enough." *Id.* at 33. Dr. McCann was "shocked" by Darnell's disinterest in regulating his condition. *Id.* at 49. Under these circumstances, additional testing was unnecessary because the results could not have refuted the fact that Darnell was unmotivated to control his diabetes.

Darnell argues that, at a minimum, Dr. McCann should have consulted his medical chart before drawing his conclusion. Generally speaking, familiarity with a patient's medical history is highly important, but here the information could not have controverted Darnell's admitted non-

compliance. Moreover, had Dr. McCann checked Darnell's medical charts, the information would have more or less borne out that, historically, his glucose levels were unpredictable as a result of his failure to regulate his condition.

Both parties' experts also agreed that Dr. McCann's opinion that Darnell's diabetes was uncontrolled was reasonable and supported by the evidence. Thermafiber's expert, Dr. John Cavanaugh, a board-certified endocrinologist and diabetes specialist, testified that the information Dr. McCann considered supported the reasonable medical conclusion that Darnell had failed to control his disease. Cavanaugh Dep. at 80. In his view, if an insulin-dependent diabetic tells a physician he is not complying with proper diabetes treatment, the physician does not "need to have that written somewhere"—in other words, does not need to have test results confirming high blood sugar or glucose fluctuations—to determine the patient is "noncompliant." *Id.* at 82. When Darnell's expert and treating physician, Dr. John Levine, was asked at his deposition whether Darnell's diabetes was uncontrolled, he conceded: "That would be a fair statement." Levine Dep. at 50. That Dr. Levine appears to have used the term in that context as being synonymous with "poorly compliant" changes nothing. With both experts in accord on this issue, we believe that Dr. McCann's assessment was a reasonable medical judgment supported by the evidence. Therefore, Thermafiber reasonably relied upon that assessment.

## B. Darnell's Uncontrolled Diabetes Made Him a Direct Threat to Workplace Safety

Darnell next argues there was no evidence that his noncompliance was likely to cause substantial injury, apart from generalizations about diabetics and Thermafiber's work environment. We disagree. It is uncontested that blood sugar levels can fluctuate dramatically when diabetes goes

unregulated. As Dr. Levine himself testified, this can cause unconsciousness, confusion, and impaired judgment. Levine Dep. at 23. Were Darnell to experience such symptoms at Thermafiber, the injury to himself or others could be great. Thermafiber employees are required to climb tall ladders, operate dangerous machinery—including saws, balers, conveyors, exhaust fans, ovens, and recycling machinery—and help lift 80-pound pieces of fiber board. The dangers posed by this environment figured prominently in Dr. McCann's assessment. He testified that "[t]here's a lot of very hot equipment around there. There are hydraulic lifts and somebody has to be acutely aware of their body 100% of the time to work in a factory like Thermafiber, and I would definitely be concerned about his level of control, he would not be alert as he should be." McCann Dep. at 51. Dr. Cavanaugh agreed that the heavy machinery inside the plant increased the risk that a diabetes-related injury would be serious. Cavanaugh Dep. at 37-38.

Darnell asserts that ominous predictions about falls from heights and injuries by heavy equipment cannot support an employer's assertion that a diabetic is a direct threat under the ADA. He relies on *EEOC v. Chrysler*, 917 F. Supp. 1164, 1171-72 (E.D. Mich. 1996), *rev'd*, 172 F.3d 48 (6th Cir. 1998) (reversed on grounds that record contained insufficient evidence to support the holding that the employer regarded the plaintiff as disabled), for this proposition. However, the plaintiff in *Chrysler* sought out regular care, kept his diabetes under good control, and was not insulin-dependent. Darnell, by contrast, admitted that his sugar levels were too high, that he does not adequately monitor his diabetes, and is insulin-dependent. It is precisely his noncompliance, poor judgment, and admittedly high glucose levels that make it likely he would eventually experience a diabetic episode at Thermafiber.

Darnell, however, claims there is no proof that a harmful episode is likely to happen. This court has recognized that

where the plaintiff's medical condition is uncontrolled, of an unlimited duration, and capable of causing serious harm, injury may be considered likely to occur. *Bekker*, 229 F.3d at 668; *see also Borgialli v. Thunder Basin Coal Co.*, 235 F.3d 1284, 1294 (10th Cir. 2000) (attributing greater weight to the "nature and severity" of the potential harm than to whether it is "likely" and "imminent" where a lapse in safety could cause serious bodily injury for multiple individuals); *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 894-95 (9th Cir. 2001) (holding that a direct threat can exist where the nature and severity of the potential harm is catastrophic, though the likelihood that it will occur is small) (citing *Turco*, 101 F.3d at 1094). Those conditions, as we have discussed, are present here.

Furthermore, Dr. McCann and both parties' medical experts agreed that his continued noncompliance increased the risk of injury on the job. Dr. McCann testified that Darnell was "certainly at risk" of passing out and causing severe harm to himself or others, McCann Dep. at 42, that the risk was "significant," *id.* at 51, and that he ascertained "a very definite likelihood" that "harm could occur." *Id.* at 42. Dr. Cavanaugh stated that it was "a reasonable medical certainty that Darnell would pass out on the job . . . sooner or later . . . ." Cavanaugh Dep. at 56. Dr. Levine testified that Darnell's noncompliance likely would increase his blood sugar levels, and that increased blood sugar levels might lead to mental confusion, impaired reasoning, and impaired judgment. Levine Dep. at 20-24.

The likelihood that Darnell's uncontrolled diabetes would cause injury was magnified by the terrific heat within the plant, which can reach 110 degrees. Dr. McCann testified that if Darnell's blood sugar level rose too high, he could become dehydrated, "especially in very hot environments, and that can certainly cause passing out at times." McCann Dep. at 19. He warned: "You get a diabetic, a poorly controlled diabetic with markedly elevated temperatures,

you're looking . . . at a disaster." *Id.* at 31. Darnell's expert confirmed that an insulin-dependent diabetic is more likely to become dehydrated in high temperatures, and that this can increase the likelihood that he will experience an episode caused by high or low blood sugar. Levine Dep. at 24.

Darnell argues that the fact that he worked at the plant for 10 months without experiencing an episode makes it doubtful that an injury is likely to occur. However, a defendant with a health condition who has experienced no on-the-job episodes can still pose a direct threat to workplace safety. *Bekker*, 229 F.3d at 668; *see also Branham v. Snow*, 392 F.3d 896, 908 (7th Cir. 2004) (reversing district court's direct threat finding where plaintiff had "exceptional control over his blood glucose levels" and "full awareness of all his reactions"). Darnell's work history did not move Dr. McCann to amend his conclusion that he would be "a danger to himself and others." McCann Dep. at 39. Dr. Cavanaugh agreed and noted that Darnell's history at Thermafiber is not surprising given that "it's a matter of probability and . . . he was [not] there that long." Cavanaugh Dep. at 70. Darnell's expert also rejected the assumption that a diabetic who has never suffered from an episode would not suffer such an event in the future. Levine Dep. at 24. We conclude that Thermafiber produced sufficient evidence for the district court to conclude as a matter of law that Darnell's uncontrolled diabetes made him a direct threat to his own safety and that of his co-workers, his relatively brief work history notwithstanding.

As a final matter, Darnell argues that Thermafiber failed to consider making reasonable accommodations for his disability, such as allowing him to take additional food and water breaks. This is inaccurate. Dr. McCann assumed that Thermafiber would afford such opportunities in rendering his assessment. McCann Dep. at 32. Moreover, it was Darnell's longstanding failure to exercise good judgment in

treating his diabetes and taking care of himself that was
the very reason Thermafiber deemed him unsafe.

### III.  Conclusion

For the reasons stated above, we AFFIRM the district
court's grant of summary judgment.


A true Copy:

      Teste:


                   _____
                   ***Clerk of the United States Court of***
                     ***Appeals for the Seventh Circuit***