RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0291p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

TODD MICHAEL,

        *Plaintiff-Appellant,*

    *v.*

CITY OF TROY POLICE DEPARTMENT; CITY OF TROY,

        *Defendants-Appellees.*

No. 14-2478

_____

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 5:12-cv-13344—Judith E. Levy, District Judge.

Argued: July 29, 2015

Decided and Filed: December 14, 2015

Before: GILMAN, COOK, and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Shawn R. Cioffi, SHEEHAN & ASSOCIATES, PLC, Rochester Hills, Michigan, for Appellant. Craig W. Lange, KIRK, HUTH, LANGE & BADALAMENTI, Clinton Township, Michigan, for Appellees. **ON BRIEF:** Shawn R. Cioffi, SHEEHAN & ASSOCIATES, PLC, Rochester Hills, Michigan, for Appellant. Craig W. Lange, Patrick S. McKay, KIRK, HUTH, LANGE & BADALAMENTI, Clinton Township, Michigan, Lori Grigg Bluhm, CITY OF TROY, Troy, Michigan, for Appellees.

    KETHLEDGE, J., delivered the opinion of the court in which COOK, J., joined. GILMAN, J. (pp. 8–20), delivered a separate dissenting opinion.

1

—————————

**OPINION**

—————————

KETHLEDGE, Circuit Judge.   The City of Troy (Michigan) Police Department placed Todd Michael, a patrol officer, on unpaid leave in 2010.  The City did so for two reasons:  first, Michael had engaged in a two-year pattern of aberrant behavior from 2007-09; and second, after Michael underwent brain surgery in 2009, two doctors concluded in detailed reports that Michael could not safely perform the functions of a patrol officer.  Michael thereafter sued the City under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.  The district court granted summary judgment to the City.  We affirm.

Michael began working for the City as a patrol officer in 1987.  In 2000 he was diagnosed as having a non-cancerous brain tumor.  Surgeries to remove the tumor in 2000 and 2001 were only partially successful; each time the surgeons could not remove certain parts of the tumor, which then continued to grow.  The City granted Michael paid medical leave for each surgery, and returned him to the force once his surgeons cleared him for work.

Beginning in 2007, however, the City became aware of aberrant behavior on Michael's part.  Among other things, Michael's then-wife Jamie found a box of empty steroid vials—some of which were labeled for veterinary use and all of which belonged to Michael—which she turned over to the City's then-Chief of Police, Charlie Craft.  Michael then demanded the vials back from Craft.  When Craft refused, Michael embarked on a two-year campaign to get them back, which included secretly recording Craft, suing Craft in small-claims court, and attempting to serve Craft with process at a party celebrating Craft's retirement from the Department.  In addition, Michael secretly recorded Jamie during their marriage-counseling sessions (they later divorced) and during family gatherings, and then—on the basis of those recordings—asked the City prosecutor to charge Jamie with perjury.  Meanwhile, the City's new Chief of Police, Gary Mayer, received reports that Michael had accompanied a cocaine dealer to several drug deals.  Mayer suspended Michael from active duty pending an investigation.

The City tabled that investigation shortly thereafter, when Michael notified them (in early 2009) that he needed brain surgery for a third time. That surgery took place as scheduled and Michael's surgeon cleared him for work in July 2009. But the City had its doubts about his fitness—largely based on Michael's aberrant behavior—so they informed Michael that he needed to pass a psychological evaluation before he returned to work.

To that end, the City referred Michael to a neuropsychologist, Dr. Firoza Van Horn. She interviewed and tested Michael for seven hours in her office, and then drafted a detailed report in which she ultimately concluded that Michael "may be a threat to himself and others." Page ID 687. Based on Van Horn's report, the City placed Michael on unpaid leave. Michael then sought a second opinion from Dr. Philip Leithen, another neuropsychologist, who interviewed Michael and pronounced him fit for duty. The City then sent Michael to another neuropsychologist, Dr. Bradley Sewick, who examined Michael in his office and wrote a detailed report that reached the same conclusion that Dr. Van Horn had reached. Two other doctors who reviewed Michael's file (but did not examine him) at the request of Michael's disability-insurance company, on the other hand, concluded that he could return to work. Finally, again on his own initiative, Michael saw Dr. Linas Bieliauskas, a professor of neuropsychology at the University of Michigan. After interviewing Michael and performing tests, Dr. Bieliauskas concluded that Michael has weak "executive functioning," that "I cannot recommend that the patient return to full patrol duties[,]" and that "[s]afety with use of weapons and high-speed driving would be in question." Page ID 877-78.

Michael gave his superiors the reports of Dr. Leithen and the insurance-company doctors, but kept Dr. Bieliauskas's report to himself. The City decided to keep Michael on unpaid leave, mostly because of the conclusions of Drs. Van Horn and Sewick, but also because Michael's own behavior tended to confirm those conclusions.

Michael thereafter brought suit under the ADA, claiming that the City had regarded Michael as disabled and discriminated against him on that basis. The district court granted summary judgment to the City, holding as a matter of law that Michael was not qualified for the position of patrol officer. We review that decision de novo. *Keith v. Cnty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013).

Michael brings his claims specifically under section 12112(a) of the ADA, which provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability[.]" 42 U.S.C. § 12112(a). Thus, to prevail on a claim under this section, a plaintiff must prove that (1) he is disabled as defined by the Act, (2) he is a "qualified individual[,]" and (3) his employer "discriminate[d]" against him "on the basis of disability." *Id.*

We focus on the second element here. The Act defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A disabled person is not qualified for an employment position, however, "if he or she poses a 'direct threat' to the health or safety of others which cannot be eliminated by a reasonable accommodation." *Mauro v. Borgess Med. Ctr.*, 137 F.3d 398, 402 (6th Cir. 1998); *see also Holiday v. City of Chattanooga*, 206 F.3d 637, 647 n.4 (6th Cir. 2000) (same); 42 U.S.C. § 12113(b). A "direct threat" is "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." *Id.* § 12111(3).

Whether an employer properly determined that a person poses a direct threat, for purposes of the ADA, depends on "the objective reasonableness of [the employer's] actions." *Bragdon v. Abbott*, 524 U.S. 624, 650 (1998). An employer's determination that a person cannot safely perform his job functions is objectively reasonable when the employer relies upon a medical opinion that is itself objectively reasonable. *See, e.g., Holiday*, 206 F.3d at 645-46; *Darnell v. Thermafiber, Inc.*, 417 F.3d 657, 660 (7th Cir. 2005). A medical opinion may conflict with other medical opinions and yet be objectively reasonable. *Bragdon*, 524 U.S. at 650 ("A health care professional who disagrees with the prevailing medical consensus may refute it by citing a credible scientific basis" for doing so).

An employer need not rely on a medical opinion, however, to determine that a person poses a direct threat. Rather, "testimonial evidence" concerning the employee's behavior "can provide sufficient support for a direct threat finding under the ADA." *Darnell*, 417 F.3d at 660. For example, in *EEOC v. Amego, Inc.*, 110 F.3d 135 (1st Cir. 1997), the plaintiff's job responsibilities included administering medication in a resident facility for persons with severe behavioral disorders. The First Circuit agreed with the plaintiff's employer that she had

"show[n] by her conduct—by behavior leading co-workers to have concerns about whether she was a risk to clients and by her two attempts to commit suicide using prescription and non-prescription drugs—that she could not reasonably be trusted to meet her responsibilities as to medications." *Id.* at 141. Thus, on the basis of behavioral evidence alone, the First Circuit held as a matter of law that the employer's determination (that the plaintiff posed a direct threat) was objectively reasonable. *Id.* at 145.

Both types of evidence support the City's determination here. First, the City relied on the opinions of Drs. Van Horn and Sewick that Michael could not safely perform the functions of a City patrol officer. Dr. Van Horn examined Michael for more than seven hours in her office and spent another nine hours reviewing her test data and preparing her report, which runs more than 11 pages single-spaced. She also reviewed the City's job description for the position of patrol officer. Page ID 677, 686. She found that "[t]he specific deficits that Officer Michael demonstrates are difficulty switching mental set and handling more than one task at a time, visual memory, tactile perception, problem solving and new learning ability." Page ID 687. She concluded that, "[f]rom a neuropsychological viewpoint, there is convincing evidence that Officer Michael is not competent to handle his duties as a police officer. Given his cognitive deficits, he may be a threat to himself and others. The fact that he tends to underreport his difficulty is a concern." *Id.*

Dr. Sewick examined Michael for 90 minutes in his office, reviewed Dr. Van Horn's report and her entire file, including her test results, and prepared a seven-page single-spaced report, in which he discussed the job functions of a City patrol officer. Dr. Sewick then sent City Captain Gerard Scherlinck a letter in which Dr. Sewick concluded as follows:

> [I]t is my opinion that because of his medical condition, Officer Michael presents with a combination of problems that I think may likely negatively impact his abilities to effectively perform the job functions of a police officer in some areas and under certain conditions. In particular, it is my opinion that the problems that I see in areas of unstructured constructional capacities, motor problem solving, marginal cognitive set shifting capacities and compromised upper extremity sensory-motor functions can likely adversely impact job functions, particularly in areas of high speed defensive driving, split-second decision making, and the hand-to-hand application of force up to and including deadly force. . . . Again, because of the presence of the problems outlined above, I do unfortunately think

that in the full capacities of a police officer, with these problems Officer Michael would pose a safety risk to himself and others under certain conditions.

These medical opinions are a galaxy apart from the ones we deemed inadequate in *Keith*—where the County's doctor dismissed out of hand Keith's ability to be a lifeguard because "[h]e's deaf[,]" 703 F.3d at 924—and in *Holiday*, where the doctor's opinion was only "two scribbled lines at the bottom of a boilerplate evaluation form." 206 F.3d at 646. Instead, both of the opinions here are objectively reasonable; and thus so was the City's reliance on them.

Michael responds that the opinions of Dr. Leithen and the insurance-company doctors (whom we collectively call "Michael's medical witnesses") show that the opinions of Drs. Van Horn and Sewick are wrong. Each of Michael's medical witnesses quarreled with Dr. Van Horn's interpretation of her test results and with her conclusions. And in many ways the reports of Michael's medical witnesses are just as detailed as the reports of Drs. Van Horn and Sewick, though neither of the insurance-company doctors examined Michael in person. That said, we doubt that the reports of Michael's medical witnesses each reflect an "individualized inquiry" as that term is used in the caselaw. That kind of inquiry requires an evaluation not only of the plaintiff's medical condition, but—more to the point—of "the effect, if any, the condition may have on *his ability to perform the job in question*." *Keith*, 703 F.3d at 923 (emphasis added). And on that point Michael's medical witnesses had relatively little to say. Only one of the doctors discussed the specific job functions of the City's patrol officers, and none ventured specifically to say that Michael could safely engage in high-speed driving or make snap decisions regarding whether to use lethal force. Those omissions are conspicuous.

But there is a larger problem with Michael's argument. Reasonable doctors of course can disagree—as they disagree here—as to whether a particular employee can safely perform the functions of his job. That is why the law requires only that the employer rely on an "objectively reasonable" opinion, rather than an opinion that is correct. *See Jarvis v. Potter*, 500 F.3d 1113, 1122 (10th Cir. 2007) ("[T]he fact-finder's role is to determine whether the employer's decision was objectively reasonable."). Indeed, in many cases, the question whether one doctor is right that an employee can safely perform his job functions, or another doctor is right that the employee cannot, will be unknowable—unless the employer runs the very risk that the law seeks to prevent. Here, the City was not required to invite a section 1983 claim later in order to avoid

an ADA claim now. Right or wrong, the opinions upon which the City relied were objectively reasonable; and that means the City is not liable.

Moreover, the City did not act on the opinions of Drs. Van Horn and Sewick alone. The second basis of the City's decision, rather, was Michael's own conduct, which Dr. Leithen and the insurance-company doctors did not discuss, and which obviously raised grave concerns regarding Michael's judgment. In a two-year span prior to Michael's third brain surgery, Michael tape-recorded his marriage-counseling sessions with his ex-wife, Jamie, and then asked a prosecutor to charge her with perjury. He possessed a box of empty steroid vials, some of whose labels were in foreign languages, and others of whose labels said "for veterinary use only." After Jamie gave those vials to Chief Craft, Michael recorded his conversations with Craft and then used those recordings to try to persuade Captain Scherlinck to return the vials. When that failed, Michael sued Craft for the vials' return and arranged for Craft to be served with process at his retirement party. The City, as noted above, also heard that Michael had accompanied a drug dealer to several drug deals. Thus, on the record here, "[i]t was eminently reasonable" for the City "to be concerned about whether [Michael] could meet [his] responsibilities, and also reasonable for it to conclude that the risk was too great to run." *Amego*, 110 F.3d at 145.

In conclusion, like the district court, we respect Michael's desire to continue making a contribution to his community as a patrol officer. On this record, however, the City's decision not to return him to duty was objectively reasonable.

The district court's judgment is affirmed.

_____

**DISSENT**

_____

GILMAN, Circuit Judge, dissenting.  I respectfully disagree with the majority's conclusion that, as a matter of law, Michael was not a "qualified individual" for the purposes of the ADA.  In addition, I believe that the district court erred in applying the law and did not properly consider all of the facts before it.  I would therefore vacate the judgment and remand the case for the jury to consider Michael's claim.

**A.  Factual background**

As the majority opinion explains, Michael underwent a variety of medical evaluations in the years before he filed his complaint against the City of Troy.  Among these evaluations was an examination performed by Dr. Linas Bieliauskas, who concluded that Michael should not be returned to his patrol duties.  The majority opinion discusses this evaluation but, as the majority acknowledges, the City was unaware of Dr. Bieliauskas's examination when it made its employment decision regarding Michael.  *See* Maj. Op. 3.  The relevant medical evaluations are accordingly as follows:

*1.  Dr. Van Horn finds Michael unfit for duty*

In December 2009, the City referred Michael to Dr. Firoza Van Horn for a comprehensive neuropsychological evaluation to determine his fitness for duty.  She examined him and reviewed both his past medical records and the City's recruitment announcement for police officers.  Taking his medical records and test results together, Dr. Van Horn concluded that Michael "has shown evidence of all of the symptoms and deficits" of deteriorating brain function.

Specifically, Dr. Van Horn found that Michael demonstrated deficits in "switching mental set and handling more than one task at a time, visual memory, tactile perception, problem solving and new learning ability."  She also concluded that, because Michael was never previously referred for a comprehensive neuropsychological exam, he "has been led to believe that despite recurrent growth of a brain tumor that necessitated three surgeries, chemotherapy,

radiation and anticonvulsant medication, he was able to return to a job that require[s] him to protect the public, enforce laws, assign areas, investigate and make arrests, direct and control traffic, write violation ticket[s], prepare reports, appear in court, provide service and assistance to [the] public, [and] protect himself among other responsibilities." Dr. Van Horn's ultimate conclusions were that "Officer Michael is not competent to handle his duties as a police officer" and that, "[g]iven his cognitive defects, he may be a threat to himself and others."

### 2. Dr. Liethen disagrees with Dr. Van Horn's conclusion

On his own accord, Michael underwent a neuropsychological assessment by Dr. Philip Liethen in February 2010. Michael was referred to Dr. Liethen by Dr. Tom Mikkelsen, who had treated Michael since June 2000. In a December 2009 letter, Dr. Mikkelsen opined that "Michael's medical condition in no way affects his ability to properly and adequately care for his children, and in no way affects his judgment or temperament." Like Dr. Van Horn, Dr. Liethen interviewed Michael and conducted neuropsychological tests. He also reviewed Dr. Van Horn's report and Dr. Mikkelsen's letter.

Dr. Liethen concluded that "Michael's cognitive profile demonstrated all major neuropsychological domains to be well within, and generally above, normal expectation. No remarkable weaknesses were demonstrated, as was consistent with Mr. Michael's presenting report of no remarkable ADL [average daily living] functional problems." Dr. Liethen also noted that his overall findings were consistent with the data documented in Dr. Van Horn's report, but that his ultimate conclusion nonetheless differed. "[T]he current findings do not indicate any functional incapacity or incompetency; the current findings do not indicate any basis for Mr. Michael not to return to duty as a police officer in the capacity in which he was serving premorbidly." Dr. Liethen specifically noted that the limited data that were present in Dr. Van Horn's report "suggest[] gross misinterpretation prejudiced toward finding incapacity/incompetency" because the objective data contradicted "at least most of" Dr. Van Horn's findings. In particular, Michael's purported "deficits" in switching mental set, visual memory, and new learning ability were all belied by Michael's average or above-average test results in those areas.

### 3. *Dr. Daniel denies that Michael is entitled to disability-insurance benefits*

In June 2010, Dr. Morad Daniel reviewed Michael's medical records and the reports of Drs. Van Horn and Liethen on behalf of the City's long-term disability insurance carrier, Standard Insurance Company.  Dr. Daniel concluded that Michael was fit for duty:  "Based on the claimant's essentially normal neurological examinations, his excellent seizure control with no seizure recurrence since 04/2009, and his most recent normal neuropsychological evaluation, there is no evidence of any active limitation that would preclude the claimant from performing his duties as a police officer on a regular basis."  He further explained that Michael did not have any "current physical or mental limitations or restrictions," and that "Dr. Van Horn's neuropsychological assessment concluded with several erroneous statements, which were not based on the claimant's actual test performance data."  Rather, Michael's "test results were within the normal range on all subtests administered."

### 4. *Dr. Sewick determines that Michael is unfit for duty*

Based on another referral by the City, Dr. Bradley Sewick evaluated Michael in August 2010.  Dr. Sewick interviewed Michael for one-and-a-half hours, reviewed Dr. Van Horn's report and raw data, Michael's medical records, and the City's records describing a police officer's duties.  He discussed some of his concerns regarding Michael's test results and ultimately concluded that Michael was unfit for duty:  "I cannot in good conscience indicate that [Michael] can safely return to the full duties required of a police officer because of concerns that I have related to the findings outlined above."

Later that same month, Dr. Sewick wrote an addendum report, explaining in greater detail why he felt that Michael was unfit for duty as a police officer:

> Based upon my review of the neuropsychological testing raw data forwarded to me by Firoza Van Horn, it is my opinion that because of his medical condition, Officer Michael presents with a combination of problems that I think may likely negatively impact his abilities to effectively perform the job functions of a police officer in some areas and under certain conditions.

Dr. Sewick thus agreed with Dr. Van Horn's conclusion.

### 5. *Dr. Benincasa denies that Michael is entitled to disability-insurance benefits*

In January 2011, Dr. Daniel Benincasa independently reviewed Michael's medical records on behalf of Standard Insurance Company. He disagreed with Dr. Van Horn's overall assessment that Michael was unfit for duty, calling Dr. Van Horn's interpretation of the data "simply baffling" and saying that she "note[d] deficits where there are none." "The neuropsychological data is essentially within normal limits, across all domains, with the exception of the Trail B test being mildly slower but not suggestive of any substantial impairment and the claimant's tactile time being mildly slower. Neither of these weaknesses would preclude work capacity as [a] police office[r]."

Dr. Benincasa instead agreed with Dr. Liethen's opinion: "The data from Dr. Liethen notes all scores and domains tested to be within the average to high[-]average range[,] which would not be indicative of any restrictions or limitations in regard to the claimant's work capacity as a police officer." He also opined that "the neuropsychological data does not reach a level of significance as to preclude [Michael] from his work capacity as Police Officer."

### B. Analysis

### 1. *A genuine dispute of material fact exists regarding the objective reasonableness of Dr. Van Horn's opinion*

As the majority explains, the key issue in deciding Michael's ADA claim is whether Michael is a "qualified individual," i.e., "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A person is *not* a "qualified individual" if the person "poses a 'direct threat' to the health or safety of others which cannot be eliminated by a reasonable accommodation." *Mauro v. Burgess Medical Ctr.*, 137 F.3d 398, 402 (6th Cir. 1998); *see also Holiday v. City of Chattanooga*, 206 F.3d 637, 647 n. 4 (6th Cir. 2000) (same); 42 U.S.C. § 12113(b). A "direct threat" is "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3).

Whether an employer has properly determined that a person poses a direct threat depends on "the objective reasonableness of [the employer's] actions." *Bragdon v. Abbott*, 524 U.S. 624,

650 (1998).  And, as the majority notes, an employer's determination that a person cannot safely perform his job functions can be objectively reasonable when the employer relies upon a medical opinion that is itself objectively reasonable.  *See, e.g., Holiday*, 206 F.3d 637, 645–46; *Darnell v. Thermafiber, Inc.*, 417 F.3d 657, 660 (7th Cir. 2005).  I therefore agree with the majority as to the applicable standard to be used in determining whether Michael posed a direct threat, but disagree as to how the majority has applied that standard in the present case.

The crux of the majority's decision is that the "opinions of [Drs. Van Horn and Sewick] are objectively reasonable; and thus so was the City's reliance on them."  Maj. Op. 6.  This conclusion, however, overlooks substantial evidence in the record demonstrating that a genuine dispute exists regarding whether the opinions of Drs. Van Horn and Sewick are in fact objectively reasonable.

First consider Dr. Van Horn's opinion.  The majority observes that Dr. Van Horn drafted a detailed report in which she ultimately concluded that Michael "may be a threat to himself and others."  Maj. Op. 3.  And, in the majority's view, this report constitutes objectively reasonable evidence that Michael was not a "qualified individual" for purposes of the ADA.  *See* Maj. Op. 6.

Other doctors, however, specifically denigrated the validity of Dr. Van Horn's conclusions.  For example, Dr. Liethen noted that the limited data that were present in Dr. Van Horn's report "suggest[ed] gross misinterpretation prejudiced toward finding incapacity/incompetency" because the objective data and Michael's test results "contradicted at least most of" Dr. Van Horn's findings.  Likewise, Dr. Daniel concluded that Dr. Van Horn's neuropsychological assessment included "several erroneous statements, which were not based on [Michael's] actual test performance data."  Dr. Van Horn's report thus appeared to ignore Michael's test results, which, according to Dr. Daniel, "were within the normal range on all subtests administered."  Finally, Dr. Benincasa independently reviewed Michael's medical records.  She disagreed with Dr. Van Horn's assessment of Michael and called Dr. Van Horn's interpretation of Michael's abilities "simply baffling" because Dr. Van Horn "note[d] deficits where there are none."

Next, consider Dr. Sewick's opinion.  As with Dr. Van Horn's opinion, the majority cites Dr. Sewick's opinion as an objectively reasonable basis for the City's conclusion that Michael could not perform his job duties.  Maj. Op. at 5–6.  Dr. Sewick, however, relied largely on the data compiled and conclusions reached by Dr. Van Horn.  Hence, to the extent that  such data and conclusions contained "gross misinterpretation[s]" and "erroneous statements"—as determined by Drs. Liethen, Daniel, and Benincasa—Dr. Sewick's report likewise contained misinterpretations and erroneous statements.  The deficiencies identified by Drs. Liethen, Daniel, and Benincasa thus indicate—at least when viewed in the light most favorable to Michael—that Drs. Van Horn and Sewick did not furnish the sort of "objectively reasonable" medical opinions on which the City could permissibly rely.

I also note the irony (and likely bias) in the fact the two doctors selected by the City to evaluate Michael found him unfit for duty, whereas the two doctors selected by the City's insurance carrier found just the opposite, thus denying Michael disability benefits despite Michael's alleged inability to perform his job duties.  The City cannot have it both ways; at the very least, the opinions of Drs. Daniel and Benincasa should be deemed to call into question the reasonableness of the opinions of Drs. Van Horn and Sewick.

The majority discounts the impact of the opinions that contradicted Drs. Van Horn and Sewick on the ground that the opinions of Drs. Liethen, Daniel, and Benincasa were themselves not objectively reasonable.  As the majority observes, an objectively reasonable medical opinion must be based on an "individualized inquiry."  *See Holiday*, 206 F.3d at 643 ("The ADA mandates an individualized inquiry in determining whether an employee's disability or other condition disqualifies him from a particular position.").  The majority contends that the opinions of Drs. Liethen, Daniel, and Benincasa were not such "individualized inquiries," Maj. Op. 6, but this court's caselaw compels the opposite conclusion.

In *Holiday*, this court explained that an "an individualized inquiry" must include an evaluation of "the individual's actual medical condition, and the impact, if any, the condition might have on that individual's ability to perform the job in question."  206 F.3d at 643.  The inquiry, in other words, must "focus[]on the medical condition's actual effect on the specific plaintiff."  *Id.*

The majority maintains that Drs. Liethen, Daniel, and Benincasa failed to meet this standard because those doctors did not evaluate Michael's on-the-job functional capacities. Maj. Op. 6. Dr. Liethen, however, specifically wrote that his findings did "not indicate any basis for Mr. Michael not to *return to duty as a police officer in the capacity in which he was serving premorbidly*." (Emphasis added.) Similarly, Dr. Daniel opined that "there is no evidence of any active limitation that would preclude the claimant from *performing his duties as a police officer on a regular basis*" (emphasis added), and Dr. Benincasa wrote that her findings "would not be indicative of any restrictions or limitations in regard to the claimant's *work capacity as a police officer*" (emphasis added). Each of the opinions in question therefore did address the impact that "[Michael's] condition might have [had] on [his] ability to perform the job in question." *Holiday*, 206 F.3d at 643. Those opinions were thus individualized inquiries, *see id.*, and the majority is consequently mistaken when it discounts the ramifications of those opinions when compared to the opinions of Drs. Van Horn and Sewick.

The majority then cites a "larger problem" with Michael's argument, opining that "[r]easonable doctors of course can disagree—just as they disagree here—as to whether a particular employee can safely perform the functions of his job." Maj. Op. 6. According to the majority, an employer may choose to rely on any objectively reasonable opinion to justify its employment action, even if that opinion conflicts with other reasonable opinions in the record. *See id.* The majority thus contends that the City in this case was free to credit an objectively reasonable opinion that it preferred over an objectively reasonable opinion that it disliked.

Maybe. But the issue in this case—as explained above—is whether the opinions of Drs. Van Horn and Sewick on which the City relied were objectively reasonable in the first place. The record, when viewed in the light most favorable to Michael, does not one-sidedly demonstrate as a matter of law a disagreement between two sets of objectively reasonable opinions about whether Michael can safely perform the duties of his job. Instead, the record shows serious deficiencies in the purportedly "reasonable" opinions on which the City relied. Hence, even if the majority is correct in concluding that an employer may choose which of several objectively reasonable medical opinions to credit, that conclusion has no application to the current case.

Nor does the caselaw that the majority cites fully support its conclusion. First, the majority relies on *Darnell v. Thermafiber, Inc.*, 417 F.3d 657 (7th Cir. 2005), in which an employer based its adverse employment action on a doctor's opinion that the claimant's diabetes was not controlled. The claimant argued that the doctor's opinion was not objectively reasonable, but the Seventh Circuit rejected the claimant's argument. In doing so, the Seventh Circuit specifically noted that "[b]oth parties' experts also agreed that [the] opinion that [the claimant's] diabetes was uncontrolled was reasonable and supported by the evidence." *Id.* at 661. "With both experts in accord on this issue," the court concluded that the opinion that the employer cited "was a reasonable medical judgment supported by the evidence," and that the employer "reasonably relied upon that assessment." *Id.* *Darnell* thus stands for the proposition that an employer may reasonably rely on a medical opinion when the parties' experts agree that the opinion in question is a reasonable evaluation. *See id.*

The current case, in contrast, could hardly be more different. Drs. Liethen, Daniel, and Benincasa did not simply opine that Dr. Van Horn's interpretation was different from their own but ultimately still reasonable. Instead, they declared that Dr. Van Horn's opinion was a "gross misinterpretation" that relied on "erroneous statements" and that, in the end, was "simply baffling." Those material criticisms of Dr. Van Horn's analysis distinguish this case from *Darnell*. The criticisms call into question whether Dr. Van Horn's analysis was objectively reasonable at all, and that, in turn, calls into question whether the City's reliance on that opinion was itself objectively reasonable.

Next, the majority cites *Holiday v. City of Chattanooga*, 206 F.3d 637, 645–46 (6th Cir. 2000). This court in *Holiday* held that the municipality did not act reasonably when it relied on a doctor's report because "the record [was] replete with factual evidence available to the City at the time . . . that flatly contradicted [the doctor's] unsubstantiated conclusion." *Id.* at 646. The current case is quite similar. Drs. Liethen, Daniel, and Benincasa each "flatly contradicted" Dr. Van Horn's opinion because Van Horn's opinion, among other things, was "unsubstantiated" by the test results on which she relied. The majority further notes that Michael gave his superiors the reports of the three doctors whose opinions were favorable to him. Maj. Op. 3. Hence, just as in *Holiday*, the City in this case relied on one doctor's opinion despite having

access to other evidence that "flatly contradicted" that opinion. And just as in *Holiday*, the City's reliance on such an opinion in the face of such contradictory evidence raises a genuine dispute regarding whether the City's decision was objectively reasonable.

The majority finally cites *Bragdon v. Abbott*, 524 U.S. 624, 650 (1998), for the proposition that "[a] medical opinion may conflict with other medical opinions and yet be objectively reasonable." Maj. Op. 4. The portion of *Bragdon* that the majority quotes, however, states only that "[a] health care professional who disagrees with the prevailing medical consensus may refute it by citing a credible scientific basis" for doing so. 524 U.S. at 650. As applied to the case at hand, the majority never explains or identifies any point at which Dr. Van Horn specifically responded to the contrary opinions of Drs. Liethen, Daniel, and Benincasa. Thus, even if Dr. Van Horn *could* have "refuted [those doctors' opinions] by citing a credible scientific basis" for doing so, *see id.*, nothing suggests that Dr. Van Horn actually did.

Moreover, the quoted statement from *Bragdon* was written in the context of a doctor who disagrees with "the views of public health authorities, such as the U.S. Public Health Service, CDC, and the National Institutes of Health." *Id.* Such a doctor may refute those views by "citing a credible scientific basis" for his or her opinion, *see id.*, but that situation was not present in the current case. Dr. Van Horn did not simply disagree with "the views of public health authorities" in general; instead, she disagreed with three other doctors who had performed an individualized assessment of Michael's ability to work as a police officer. The situation in *Bragdon* is thus readily distinguishable from the present case. As such, *Bragdon* does not impugn my conclusion that the opinions of Drs. Liethen, Daniel, and Benincasa created a genuine dispute of material fact regarding whether Dr. Van Horn's opinion was objectively reasonable.

And even if the majority's broad proposition that employers can never be penalized for choosing to credit one objectively reasonable medical opinion over another objectively reasonable medical opinion is correct, there must come a point where a medical opinion ceases to be objectively reasonable. A contrary rule would allow an employer to avoid liability for an adverse employment action simply by seeking the opinion of a doctor known to consistently favor the employer. This expedient would strip employees of the protections that the ADA was

intended to provide, and it accordingly cannot be the law.  *See, e.g.*, *Holiday*, 206 F.3d at 645 ("Employers do not escape their legal obligations under the ADA by contracting out certain hiring and personnel functions to third parties.").

Instead, "courts should assess the objective reasonableness of the views of health care professionals . . . ."  *Bragdon*, 524 U.S. at 650.  Drawing the line between a reasonable versus an unreasonable medical opinion might at times prove difficult, but this court in *Holiday* noted that, at the very least, a medical opinion ceases to be objectively reasonable when "the record is replete with factual evidence available to the City at the time . . . that flatly contradict[s] [a doctor's] unsubstantiated conclusion."  206 F.3d at 646.

This case presents just such a situation.  The opinions of Drs. Liethen, Daniel, and Benincasa did not simply contradict Dr. Van Horn's opinion.  Rather, they called it erroneous, inconsistent with the evidence, and baffling.  That is enough to raise a genuine dispute about the objective reasonableness of Dr. Van Horn's opinion, *see id.*, a dispute that should be submitted to a jury for resolution.

Moreover, I would instruct the district court to alter its analysis on remand.  The district court in this case—like the majority's opinion on appeal—concluded that the opinions of Drs. Liethen, Daniel, and Benincasa were immaterial because the opinions were ostensibly not "individualized inquiries."  In so concluding, the district court used an unpublished decision from this court and an unpublished opinion from its own district to fashion the following test for determining whether an inquiry is individualized:  "An inquiry meets this requirement if the examining doctor is familiar with the relevant job duties, obtains 'much individualized information' about the employee's medical condition, has current knowledge of the employee's medical condition, examines the employee in person, and reviews the records of the employee's other treating physicians."  (citing *Wurzel v. Whirlpool Corp.*, 482 F. App'x 1, 15 (6th Cir. 2012), and *Jennings v. Dow Corning Corp.*, No. 12-12227, 2013 WL 1962333, *10 (E.D. Mich. May 10, 2013)).

The district court's derivation and application of this test was erroneous for at least two reasons.  First, the court disqualified the opinions of Drs. Daniel and Benincasa because neither doctor interviewed Michael in person.  But an in-person review is not a prerequisite for

conducting an individualized inquiry; rather, this court's guidance is much more general.   In *Holiday*, for instance, this court noted that an "individualized inquiry" accounts for "the impact, if any, the condition might have on [the] individual's ability to perform the job in question."  206 F.3d at 643.  The same conclusion was reached in *Keith v. County of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013).   Neither *Holiday* nor *Keith* describes the exact procedure that a doctor must follow in order to reach his or her conclusions and, in particular, neither case states that the individualized inquiry must include a personal examination.   The district court thus erred in engrafting an inflexible personal-examination requirement on the individualized-inquiry analysis.

Second, the district court incorrectly applied its own self-designed test.  The court, for example, stated that a doctor performing an individualized inquiry must be "familiar with the relevant job duties" of the position in question.  In this case, Dr. Liethen opined that Michael was fit "to return to duty as a police officer *in the capacity in which he was serving premorbidly*," (emphasis added), indicating that Dr. Liethen was indeed familiar with Michael's relevant job duties.  When evaluating Dr. Liethen's opinion, however, the district court nonetheless found that the opinion was insufficient.  The court faulted Dr. Liethen for not specifically reviewing the City's formal job description for Michael's police-officer position.  It thus apparently concluded that, without such a review, the doctor could not be familiar enough with Michael's duties to complete an individualized inquiry.

This conclusion was erroneous.  Just as the law does not require a doctor to personally examine a claimant before making an individualized inquiry, neither does the law require a doctor to review an employer's formal job description in order to do so.  *See* 42 U.S.C. § 12111(8) (stating only that an employer's job description "shall be considered evidence of the essential functions of the job"); *Holiday*, 206 F.3d at 643–44 (making no mention of the specific steps that a doctor must take to become familiar with a job's requirements when conducting an individualized inquiry); *cf. Tuck v. HCA Health Servs. of Tennessee, Inc.*, 7 F.3d 465, 472 (6th Cir. 1993) (noting that a written job description was *not* controlling in determining whether the claimant could perform a position's essential functions).  The district court thus erred by

imposing a rigid requirement that a doctor *must* review a formal job description for the position in question before the doctor's analysis constitutes an individualized inquiry.

For these reasons, I would reverse the judgment of the district court and remand the case for a proper analysis of the individualized-inquiry issue. The opinions of Drs. Liethen, Daniel, and Benincasa were sufficient to meet the standard for individualized inquiries articulated in *Holiday* and *Keith*, and the district court should not have created a new, stricter test in order to reject those opinions out of hand. Instead, the court should have considered whether those opinions present a genuine dispute of material fact regarding the objective reasonableness of the opinions of Drs. Van Horn and Sewick. My assessment—as described above—is that the opinions from Drs. Liethen, Daniel, and Benincasa were indeed sufficient to call into question the reasonableness of the opinions from Drs. Van Horn and Sewick, and I would therefore instruct the district court to allow the jury to resolve whether the City's decision in this case was objectively reasonable.

### 2. The nonmedical evidence is not sufficient to justify summary judgment in favor of the City

The majority also rests its analysis on the presence of nonmedical evidence showing that Michael engaged in sporadic acts of aberrant behavior during the two-year period prior to his third brain surgery. Maj. Op. 7. Such evidence, according to the majority, indicates that Michael posed a direct threat to the safety of himself or others and was in and of itself sufficient for the City to conclude that Michael could not perform his duties as a police officer. Maj. Op. 4–5.

To support this proposition, the majority relies on *EEOC v. Amego*, 110 F.3d 135 (1st Cir. 1997). There, an employee's duties included dispensing certain medications to disabled patients, but the employee both appeared to be overmedicating patients, *see id.* at 145, and twice attempted to commit suicide by overdosing on those same medications, *id.* at 142. The employer decided that such use of the medications posed a direct threat to the health of the employee and to others around her, and the First Circuit affirmed the grant of summary judgment for the employer. *Id.* at 149. In doing so, the court observed that the misapplication and misuse of the medications in question posed an "obvious and extreme" danger that justified a conclusion that the employee was a direct threat. *Id.* at 146. In addition, the court noted that the medical

evidence in the record did not contradict the conclusion that the employee posed a threat to others' safety. *See id.* (observing that the employee's social worker "[did not] respond[] to the substance of the [employer's] request for information" and that the employee's psychopharmacologist was "unresponsive to [the employer's] concerns").

The current case presents a significantly different situation. First, Michael never attempted to harm himself or others as did the claimant in *Amego*. The behavior noted was concededly odd, but it did not involve the "obvious and extreme" danger inherent in the suicide attempts in *Amego*. Second, Drs. Liethen, Daniel, and Benincasa each opined that Michael was still able to safely perform his duties. The medical evidence in this case—as opposed to the medical evidence in *Amego*—therefore *did* contradict the conclusion that Michael posed a direct threat to himself or others.

For these reasons, the record in this case is not nearly as one-sided as the record in *Amego*. Michael both (1) did not exhibit behavior that was as extreme as the behavior in *Amego*, and (2) presented medical evidence that contradicted the employer's position to a greater degree than did the medical evidence in *Amego*. Hence, even if the First Circuit in *Amego* was correct to affirm the grant of summary judgment for the employer, the record in this case is not so clear as to find that Michael was unfit as a matter of law. *See, e.g.*, *Holiday*, 206 F.3d at 645 (reversing summary judgment where the employer relied on evidence that was "at odds with [other] evidence on record").

In the end, Michael's ADA claim might not succeed. A jury could find that Drs. Van Horn and Sewick did in fact present objectively reasonable opinions about Michael's inability to perform his job duties. And a jury could find that the aberrant behavior that Michael demonstrated was sufficient for the City to conclude that he was no longer a "qualified individual." For the reasons explained above, however, a jury could also come to the opposite conclusion on each of these issues. That makes summary judgment inappropriate, and I would accordingly reverse the judgment of the district court and remand this case for a trial by jury.