In the

# United States Court of Appeals
## For the Seventh Circuit

No. 21-1612

RUSSELL PONTINEN,

*Plaintiff-Appellant,*

*v.*

UNITED STATES STEEL CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 18-cv-232 — **Andrew P. Rodovich**, *Magistrate Judge.*

ARGUED NOVEMBER 3, 2021 — DECIDED FEBRUARY 11, 2022

Before KANNE, BRENNAN, and KIRSCH, *Circuit Judges.*

KANNE, *Circuit Judge.* Russell Pontinen applied to work as a Utility Person at United States Steel Corporation's ("USS") Midwest Plant and received a contingent employment offer. After a diligent investigation, USS discovered that Pontinen suffered from an uncontrolled seizure disorder and imposed work restrictions on him. The restrictions conflicted with the requirements of the position he applied for, so USS rescinded its employment offer. Because USS has carried its burden to

show that Pontinen's seizure disorder would pose a direct threat to himself and others at its Midwest Plant, summary judgment on his ADA claim was proper.

## I. BACKGROUND

Russell Pontinen has experienced three or four seizures during his lifetime. The first occurred when he was eight years old, and the second when he was twenty-two. His third seizure happened in June 2014 and was followed two months later by what he now calls a "heat-related illness," but what may very well have been a fourth seizure. Before his second and third seizures, Pontinen says he felt "fuzziness" in his left eye, a "warning signal" of sorts. The signal gave him somewhere between thirty seconds and two minutes to prepare.

After the June 2014 seizure, Pontinen began seeing Dr. George Abu-Aita, a neurologist. Dr. Abu-Aita determined that Pontinen's seizure disorder was "not well controlled" and prescribed him Trileptal, but Pontinen experienced negative side effects from the drug and failed to take it "faithfully and daily." After the possible seizure in August 2014, Dr. Abu-Aita switched Pontinen to a medication called Depakote. By the end of October 2014, Dr. Abu-Aita thought the seizure disorder was "well controlled with Depakote." His notes warned, "Do not miss your medication."

Each February from 2015 to 2017, Pontinen saw Dr. Abu-Aita again for follow-up appointments. In 2015, Dr. Abu-Aita wrote that the seizure disorder "seem[ed] to be well controlled," that Pontinen reported missing doses "once in a blue moon," and that he told Pontinen he should never do that.

In 2016, Dr. Abu-Aita reported for the first time that Pontinen asked "if he can get off the Depakote." Dr. Abu-Aita

added, "I told him since he had three seizures in his life and he has a sister with seizures he is at higher risk of having seizures in the future, I do not recommend being off medication." He acknowledged that Pontinen agreed to stick with Depakote for another year and reiterated, "Do not miss taking your medication."

In 2017, Dr. Abu-Aita noted that Pontinen "is still asking me … to stop taking the medication." Dr. Abu-Aita told him that "he is at higher risk of having seizures at any time," but Pontinen "still insist[ed]." Finally, Dr. Abu-Aita relented: "Since it is his decision to get off the medication I will reduce the Depakote 1000 mg every night for a month and if no seizures to 500 mg every night for a month and if no seizure to stop it."

A few months later, in May 2017, Pontinen applied to work as a Utility Person at USS's Midwest Plant. Those who hold the Utility Person position "operate[] equipment and perform[] tasks that support the various production and service units." They perform "general labor duties that include the use of torches, shovels and other hand tools," and control "mobile equipment, in a heavy industrial environment." It is a "safety-sensitive" and "safety-critical" position that involves

> safety hazards associated with being around and using pneumatic equipment, oxygen lances, power actuated tools and torches; … handling, transporting, processing product and materials; … working with and around materials that may be hot, heavy or sharp, and hazardous chemicals; … assisting in inspecting and performing maintenance on equipment; and … working in close proximity to molten metal.

They are at risk of "burn injuries, falls, and being struck by equipment." After a brief training period, Utility Persons are "expected to move into a Utility Technician position which includes operati[ng] … overhead and mobile cranes of various sizes and types, tractors, trucks, dozers, loaders, boom trucks, and feeders."

Pontinen received an employment offer contingent upon passing a pre-placement fitness-for-duty examination. The exam, conducted by Nurse Practitioner Jennifer Ntovas on May 15, 2017, revealed that Pontinen had a history of seizures. Before the exam, Pontinen disclosed on his Health Inventory Form that he had had four seizures in his life. Then, during the examination, Ntovas wrote, using the medical shorthand for "without," that Pontinen "stopped Depakote [without] neurologist approval." After the exam, she signed and dated a form ("Restrictions Form") that would later be filled in with any work restrictions that she thought necessary to impose on Pontinen.

Next, Ntovas sought information from Pontinen's treating neurologist, Dr. Abu-Aita. Using a Medical Referral form, she requested from Dr. Abu-Aita a "diagnosis, plan of care, last MRI/EEG, date last seen, last documented seizure (and type), and if compliant [with] medication." She explained that the Utility Person position "may involve temperature extremes, pushing, pulling, [and] extensive ambulation." Dr. Abu-Aita returned the form with a box checked that indicated that his medical findings "are not expected to affect the safety or health as it relates to the job." He also had Pontinen undergo an EEG, which found "no focal, lateralized, or epileptiform discharge noted"—a normal result. He did not otherwise respond to Ntovas's request for information.

Another consideration that USS makes in assessing whether an applicant is qualified for the Utility Person position is whether they meet the requirements of the U.S. Department of Transportation's ("DOT") Federal Motor Carrier Safety Administration Medical Handbook. 49 C.F.R. § 391.41 (2021). The handbook sets certain physical qualifications for drivers of commercial motor vehicles. One such qualification is that the driver "[h]as no established medical history or clinical diagnosis of epilepsy or any other condition which is likely to cause loss of consciousness or any loss of ability to control a commercial motor vehicle." *Id.* § 391.41(b)(8).

Generally, the regulations require an unmedicated driver to be seizure-free for ten years, but a driver with a seizure-disorder diagnosis can apply for a reduction of the requirement to eight seizure-free years, on or off medication. *See* Fed. Motor Carrier Safety Admin., *Federal Seizure Exemption Application*, FMCSA, https://www.fmcsa.dot.gov/medical/driver-medical-requirements/new-seizure-applicant-doc-email-version (last updated April 19, 2021). If the driver is taking medication, the type, dosage, and frequency must be stable for two years. *Id.*

Based upon the DOT regulations, the Health Inventory Form, the physical examination, Dr. Abu-Aita's response to the Medical Referral form, and Dr. Abu-Aita's treatment notes, Ntovas and USS Medical Director, Dr. Philippa Norman, determined appropriate work restrictions for Pontinen. They determined that he could work, but only if he avoided "jobs higher than five feet, … Extensive Stairs/Ladder/Free Climbing, … Exposure to Hazardous Machinery," and operating "cranes or mobile equipment." Pontinen was also

required to seek "[a]pproval through Medical prior to job change."

The restrictions were sent to the Human Resources ("HR") Department, which concluded that these restrictions could not be accommodated. On July 17, 2017, USS notified Pontinen that "based on the results of [his] pre-placement fitness for duty examination," his offer of employment was rescinded.

Pontinen sued USS in the Northern District of Indiana for disability discrimination under the Americans with Disabilities Act ("ADA"). He argued that USS illegally discriminated against him on the basis of a real or perceived disability when it rescinded his employment offer. The parties consented to proceed before a magistrate judge, including trial, final judgment, and all post-judgment proceedings. In September 2020, USS filed a motion for summary judgment, which the district court granted because Pontinen's "uncontrolled epileptic condition would have posed a direct threat to the health and safety of himself and others while working at USS." Pontinen now appeals.

## II. ANALYSIS

We review *de novo* a district court's grant of summary judgment. *Darnell v. Thermafiber, Inc.*, 417 F.3d 657, 659 (7th Cir. 2005). Summary judgment is appropriate if, construing all facts and inferences in the light most favorable to Pontinen, there is no genuine issue as to any material fact and USS is entitled to judgment as a matter of law. *See id.*

Among other things, the ADA prohibits certain employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to … hiring." 42 U.S.C. § 12112(a).

A qualified individual is "an individual who, with or without reasonable accommodation, can perform the essential functions" of the job. *Id.* § 12111(8). One form of impermissible discrimination is "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard … is shown to be job-related … and is consistent with business necessity." *Id.* § 12112(b)(6). Accordingly, a requirement that a potential employee "not pose a direct threat to the health or safety of others in the workplace," is permissible, even if it tends to discriminate. *Id.* § 12113(b). This rule also extends to a requirement that an individual not pose a threat to his own health and safety in the workplace. *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 76 (2002) (approving of EEOC regulation expanding direct-threat defense).

While it is the plaintiff-employee's burden to show that he is a "qualified individual," which means he can perform the "essential functions" or "duties" of the job with or without reasonable accommodation, 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n)(1), it is the defendant-employer's burden to show that qualification standards that "tend to screen out … individual[s] with a disability" escape liability because those qualification standards are necessary to prevent "a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(a)–(b); *Branham v. Snow*, 392 F.3d 896, 907 (7th Cir. 2004). Thus, the difference between "qualified individual" and "qualification standards" is "crucial" because it impacts which party bears the burden of proof. *See Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 990 (9th Cir. 2007) (en banc).

So, what is a direct threat? That term "means a significant risk of substantial harm … that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r) (2012); *see also Branham*, 392 F.3d at 905–06. Any determination that someone poses a direct threat must rely on an "individualized assessment of the individual's present ability to safely perform the essential functions of the job." 29 C.F.R. § 1630.2(r). In turn, "a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence" must inform the assessment. *Id.* The assessment must consider: "(1) [t]he duration of the risk; (2) [t]he nature and severity of the potential harm; (3) [t]he likelihood that the potential harm will occur; and (4) [t]he imminence of the potential harm." *Id.*; *see also Stragapede v. City of Evanston*, 865 F.3d 861, 866 (7th Cir. 2017) (citing *Emerson v. N. States Power Co.*, 256 F.3d 506, 514 (7th Cir. 2001)).

*A. Adequate Medical Evidence*

Before engaging the substance of the direct-threat analysis, we seek to understand whether the employer's decision was based on appropriate evidence and a truly individualized assessment. *See Darnell*, 417 F.3d at 660. Here, the ultimate decision by USS was based on the restrictions determined by Ntovas and Dr. Norman. Therefore, their analysis is what must be a "reasonable medical judgment" that relies on appropriate evidence.

Ntovas and Dr. Norman considered the DOT regulations; the Health Inventory Form; the physical examination; Dr. Abu-Aita's response to the Medical Referral form, including the clean EEG; and Dr. Abu-Aita's treatment notes. These sources all either represent "current medical knowledge" or are the "best available objective evidence." To the extent that

Ntovas and Dr. Norman gave more weight to some of the evidence, that was within their "reasonable medical judgment."

There is no question, however, that their judgment was premised on the consideration of adequate evidence, as contemplated by the ADA and supporting regulations. *See, e.g.*, *Darnell*, 417 F.3d at 660 (noting that even "testimonial evidence can provide sufficient support for a direct threat finding"); *Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662, 668 (7th Cir. 2000) (approving of district court analysis finding that "employee and patient reports of her smelling of alcohol constituted sufficiently objective evidence").

### B. Individualized Assessment

Pontinen argues that the assessment USS conducted was not sufficiently individual. He contends that he was "categorically disqualified based on preconceived notions of 'seizures.'" Appellant's Br. at 27. But that is not true.

The restrictions were based primarily on the fact that Pontinen suffers from an *uncontrolled* seizure disorder. This was evident from Pontinen's own statements that he stopped taking Depakote, Ntovas's notes from the fitness-for-duty exam, and Dr. Abu-Aita's progress notes, among other things. It is also undisputed that when Pontinen has seizures, he tends to lose consciousness. Therefore, USS's imposition of restrictions was based on information pertinent to Pontinen's personal experience with his seizure disorder. That is sufficiently individual.

Pontinen also argues that reliance on the DOT regulations constituted impermissible categorical discrimination. He points to Ntovas's statement in her deposition that she would have imposed the same restrictions even if Pontinen had

never stopped taking Depakote. That statement addresses an interesting hypothetical that would present a different question to our court. That question would be: If USS's decision were based exclusively on the DOT regulations, would that constitute an individualized assessment? However, in the case before us, the restrictions were based on much more than the DOT regulations. And it is beyond dispute that the remaining evidence is highly individualized.

*C. Pontinen's Seizure Disorder is Uncontrolled*

Next, we agree with the district court that whether Pontinen's seizure disorder was controlled is a material fact about which there is no genuine dispute. Pontinen argues that USS "and its medical personnel conflated the fact that [he] was not actively medicated with his condition being 'uncontrolled' and that he had disregarded his neurologist's treatment plan." Appellant's Br. at 20.

He claims that a few pieces of evidence support his contention. First, although Ntovas wrote on his examination form that he stopped Depakote without Dr. Abu-Aita's approval, Pontinen claims her deposition transcript refutes the assertion because Ntovas could not recall what specifically Pontinen told her. And in his own deposition, he claims she mischaracterized his answers in arriving at that conclusion. Second, his EEG results were normal. Third, he was on medication and seizure-free for almost three years. Fourth, he asserts that he only came off of Depakote with Dr. Abu-Aita's approval, and that the neurologist's progress notes show that. And fifth, the Medical Referral form that Dr. Abu-Aita returned to Ntovas cleared him to work with no restrictions.

None of these pieces of evidence create a genuine dispute. Dr. Abu-Aita's progress notes are clear: Pontinen's seizure disorder was "not well controlled" when he first started seeing him but was "well controlled with Depakote." He repeatedly told Pontinen to never miss a dose because he is at a high risk for having a seizure. Pontinen repeatedly asked to stop taking Depakote but agreed to keep taking it at Dr. Abu-Aita's request.

But, in February 2017, he stopped agreeing and "insist[ed]" on coming off, despite the high risk. Only then, "[s]ince it is [Pontinen's] decision to get off the medication," did the neurologist ensure it was done as safely as possible by showing him how to wean himself off of it. Dr. Abu-Aita unequivocally did not approve of the decision.

The dispute about what was said to Ntovas at the physical examination does nothing to refute what is clear in the notes. Next, the fact that he had no seizures while taking medication actually works against Pontinen, showing the benefits of controlling his disorder with medication. The same can be said for the clean EEG, taken shortly after he came off of Depakote. Finally, the fact that Dr. Abu-Aita cleared him to work at USS with no restrictions likewise speaks to the good condition he was in shortly after coming off of Depakote, but does not contradict in any way that his seizure disorder had become uncontrolled and that the risk of a seizure had markedly increased.

The evidence shows that Pontinen stopped listening to his neurologist and doing the one thing that brought his disorder under control. Therefore, we agree that the undisputed evidence shows that his disorder was uncontrolled at the time he applied to work as a Utility Person at USS. *See Darnell*, 417

F.3d at 659–61 (finding that applicant who was "disinterest[ed] in regulating his condition" had uncontrolled diabetes). Now that his disorder is not under control, Pontinen has returned to a state of high risk for a seizure.

*D. Direct Threat Analysis*

"[I]n order to prevail on its summary judgment motion asserting that [Pontinen] posed a direct threat to himself and others, [USS] must show that the evidence on the question of direct threat is so one-sided no reasonable jury could find for [Pontinen]." *Branham*, 392 F.3d at 907 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986)).

*1. Duration of the Risk*

The first factor that the ADA requires us to assess is the duration of the risk. The parties dispute whether the duration of the risk is the length of one seizure or indefinite. The district court relied on *E.E.O.C. v. Rexnord Industries, LLC* for the proposition that, "[g]enerally speaking, if the risk is not controlled or controllable, the duration is indefinite and thus would weigh more heavily in favor of a finding of direct threat." 966 F. Supp. 2d 829, 837 (E.D. Wis. 2013) (collecting Seventh Circuit cases, among others). We recognize that there is contrary nonbinding authority, *see, e.g.*, *E.E.O.C. v. Kinney Shoe Corp.*, 917 F. Supp. 419, 429 (W.D. Va. 1996) (finding that duration of risk of seizure was fleeting), but we agree with the *Rexnord* proposition, at least as applied here. Dr. Abu-Aita warned Pontinen that going off of his medication would put him at an elevated risk of having a seizure, yet he insisted on discontinuing his medication. We find that the duration of the risk is indefinite. This weighs in favor of a direct-threat finding.

*2. Nature and Severity of Potential Harm*

The next area of assessment is the nature and severity of potential harm. Pontinen argues that the nature and severity of the potential harm are low because he sometimes gets a "warning signal" anywhere from thirty seconds to two minutes before the seizure's onset. He argues that this gives him enough time to remove himself from any dangerous situation, retreat to a safe place, and prepare for the seizure. He told this to Dr. Abu-Aita, who wrote it in his notes. However, he only got a warning signal before two of his three or four seizures, so it is not guaranteed that it would happen again. And if warned, there is no guarantee how much warning he would get or that he would be able to get to safety. Considering Pontinen's seizures cause him to lose consciousness, the consequences in the Midwest Plant could be disastrous.

We already recited at length the requirements of the "safety-critical" Utility Person position. It involves working with and around torches, shovels, power actuated tools, mobile equipment, pneumatic equipment, oxygen lances, materials that may be hot, heavy, or sharp, hazardous chemicals, and molten metal, and will involve, eventually, cranes, tractors, trucks, dozers, loaders, boom trucks, and feeders.

Given the unreliability of his warning signal and the potentially catastrophic consequences of losing consciousness in this dangerous setting, the nature and severity of the risk necessarily weigh in favor of a direct-threat finding.

*3. Likelihood that Harm Will Occur*

We have "recognized that where the plaintiff's medical condition is uncontrolled, of an unlimited duration, and capable of causing serious harm, injury may be considered

likely to occur." *Darnell*, 417 F.3d at 662 (citing *Bekker*, 229 F.3d at 668). The best available objective medical evidence here demonstrates that all three of these characteristics are true with respect to Pontinen's seizure disorder. Therefore, we conclude that harm is likely to occur, and this factor also favors a direct-threat finding.

### 4. *Imminence of Harm*

Finally, with respect to imminence, the undisputed evidence is more mixed. Pontinen's medical history shows only four seizures spread over many years, so it is true that they are fairly rare. However, just before and after he began controlling his seizure disorder with Depakote, there were two incidents in as many months. And now that he has stopped taking the medication, he is at a higher risk of having a seizure. It is possible that he could have a seizure at any moment, but most of his seizures have been separated by long, uneventful periods. This factor weighs in favor of USS, but not as heavily as the others.

### 5. *Weighing the Factors*

Because all of the factors weigh in favor of finding that there is a direct threat, we are compelled to reach that conclusion. While Pontinen can point to a few pieces of evidence that support the idea that he has been doing well, he cannot point to evidence that creates a genuine dispute of material fact with regard to whether USS's decision to rescind his employment offer because he constituted a threat to himself and others was proper. The evidence shows that USS's determination relied on appropriate evidence, was made after an individualized assessment, and revealed an uncontrolled seizure disorder that would create an intolerable risk at its Midwest

Plant. In other words, "the evidence on the question of direct threat is so one-sided [that] no reasonable jury could find for [Pontinen]." *Branham*, 392 F.3d at 907. Therefore, it was not a violation of the ADA for USS to rescind, on that basis, the job offer it extended to Pontinen.

\*         \*         \*

Although USS also raised in the district court the argument that Pontinen cannot make out a *prima facie* case of disability discrimination because he cannot show that his seizure disorder was the "but for" cause of the decision to rescind his offer, the district court found that argument unnecessary to address, instead finding the direct-threat analysis dispositive. USS again raises this argument on appeal, but considering the outcome of our direct-threat analysis, we, too, have no need to address this argument.

### III. CONCLUSION

Because USS has shown through undisputed evidence that, if hired for the Utility Person position, Pontinen's seizure disorder would pose a direct threat to himself and others at the Midwest Plant, summary judgment was proper. We AFFIRM.