In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 21-2291

RICHARD WHITE,

*Plaintiff-Appellant,*

*v.*

BLAKE WOODS and
ALFONSO DAVID,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:18-cv-00165-SPM — **Stephen P. McGlynn**, *Judge.*

———————————

ARGUED MARCH 29, 2022 — DECIDED SEPTEMBER 19, 2022

———————————

Before FLAUM, ST. EVE, and JACKSON-AKIWUMI, *Circuit Judges.*

JACKSON-AKIWUMI, *Circuit Judge.* Richard White injured his left knee while incarcerated and playing basketball at Shawnee Correctional Center in Illinois in June 2015. From the date of his injury through November 2017, White complained about knee pain to various prison nurses and doctors, including Nurse Practitioner Blake Woods and Doctor Alfonso

David. Nurse Woods and Dr. David met White's complaints with "conservative" treatment, and White did not receive a magnetic resonance imaging ("MRI") for his knee until December 2017. The MRI revealed that White had a serious knee injury that required surgery.

White brought suit under 42 U.S.C. § 1983 against Nurse Woods, Dr. David, and the prison's healthcare provider, Wexford Health Sources, Inc., alleging that the defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. The district court dismissed White's claims at various stages of the litigation. On appeal, White challenges three of the court's decisions. First, White argues that the district court improperly dismissed Wexford from the suit at screening by reading White's complaint to contain only a theory of liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), against Wexford, instead of reading the complaint to also allege a negligence claim against the company. Second, White argues that the district court abused its discretion by denying White leave to amend the complaint to add negligence claims against the defendants. Finally, White argues that the district court improperly granted Nurse Woods and Dr. David summary judgment on his deliberate indifference claims.

Because the evidence viewed in the light most favorable to White shows a factual dispute over whether Nurse Woods and Dr. David were deliberately indifferent to White's knee condition, we vacate the district court's dismissal of those claims. We affirm in all other respects.

## I.  Background

### A.  White's Knee Injury and Treatment

We recount the facts in the light most favorable to White, the nonmoving party. *Stewardson v. Biggs*, __F.4th ___, 2022 WL 3131817, at *1 (7th Cir. Aug. 5, 2022). On June 26, 2015, White was playing basketball at Shawnee Correctional Center when someone landed on his left knee, injuring it. Between June 2015 and November 2017, medical staff saw White for left knee pain at the prison's medical unit at least fifteen times. Below, we summarize some of those encounters.

On the day of his injury, White was escorted to the medical unit in a wheelchair. But Nurse Woods did not examine White because he did not have an appointment. Instead, Nurse Woods told a non-party nurse to give White crutches. Four days later, Nurse Woods saw White and assessed White's knee pain, scheduled a follow-up appointment for July 10, and ordered crutches for White. Nurse Woods's treatment notes do not indicate whether Nurse Woods performed a complete physical examination on White.

On July 3, White's left knee "popped." White saw a non-party nurse who told Nurse Woods that White was unable to extend or bend his leg but had no swelling or obvious deformity. Nurse Woods prescribed a steroid, an anti-inflammatory, and a leg wrap. For the first time, he also ordered an X-ray of White's knee, which showed that White had osteoarthritis and knee joint effusion (a collection of fluid in the knee), but no fractures or dislocations.

During the follow up appointment on July 10, Nurse Woods noted that White's left knee was "still swollen" and that White was not using his crutches. Nurse Woods

prescribed anti-inflammatory medicine for a month and told White to follow up as needed. Nurse Woods's notes do not indicate whether Nurse Woods conducted a complete physical examination on White during this visit. There is also no indication that Nurse Woods did anything to rule out an anterior cruciate ligament ("ACL") tear or a meniscus tear. According to Nurse Woods, "the only objective way to diagnose [those injuries]" would have been through an MRI, but he believed that it "wasn't time to do one yet."

On July 17, White saw a non-party nurse and complained of a limp and an inability to straighten his left leg. Via the non-party nurse, Nurse Woods advised White to continue the prescribed anti-inflammatory medicine.

On August 10, White saw a non-party nurse and complained of left knee pain, and he received crutches. On August 11, White saw Nurse Woods and complained of left knee pain. According to Nurse Woods's treatment notes, White's knee had moderate swelling and mild warmth. Nurse Woods performed a "drawer test" to assess White's ACL and the test was negative. On this day, nearly seven weeks after White was wheeled into the medical unit for his knee injury, Nurse Woods finally referred White to Dr. David to assess White's left knee pain because he "knew that [White] would probably need something more … likely a specialty referral or an MRI."

On August 13, one day shy of seven weeks after White's knee injury, Dr. David saw White for the first time. White complained of left knee pain and that his knee kept "popping out" of place. According to Dr. David's treatment notes, White had a tender knee and was unable to fully extend it, but White also had not complied with directions to use crutches. Dr. David diagnosed White with a left knee ligament strain.

He ordered White to use crutches for three weeks and take anti-inflammatory medicine. He also ordered a second X-ray of White's knee. The X-ray revealed excess fluid around the knee but no fracture.

On September 8, about ten weeks after White's injury and four weeks after he first saw Dr. David, two relevant events occurred. First, White saw Dr. David at a follow up appointment. White complained that he still had knee pain and his knee still frequently popped out or gave out. Dr. David noted that White had a limp and was unable to fully extend his leg, but a "Lachman test" to diagnose an ACL injury was negative. Second, Dr. David asked Wexford's collegial review board[1] to approve an MRI[2] referral for White. Dr. David thought that White had a ligament tear or strain, which an MRI could diagnose. Dr. David further noted that conservative treatments had failed. Wexford rejected the request and recommended that White receive physical therapy instead.

On September 18, White saw a physical therapist who performed a full physical examination and diagnosed White with a possible internal derangement of the knee due to a sports injury. The therapist observed that White had no swelling, redness, or warmth. The therapist believed White's knee had good rehab potential and recommended that White receive skilled physical therapy.

---

[1] Wexford's collegial review board is a board of doctors who review and approve medical requests. *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 222–23 (7th Cir. 2021) (noting that Wexford's collegial review policy "requires Wexford's corporate office to preapprove offsite care").

[2] MRIs capture soft tissue imaging, while X-rays do not show soft tissue or inflammation well.

For the next two months, White participated in physical therapy. In the meantime, he continued to complain of knee pain, but Dr. David recommended that he continue physical therapy before scheduling another appointment. On November 30, after White completed physical therapy, he saw Dr. David again. Dr. David noted that White's knee was unremarkable with no motion limitation and good strength. He also noted that White was walking normally and able to do squats.

On January 28, 2016, however, White's knee "snapped out of place" again. He saw a non-party nurse and complained that his knee pain was an eight on a ten-point scale. The non-party nurse referred White to be seen by a doctor. The next day, Nurse Woods saw White and noted an "unresolved ACL issue."

On March 14, Dr. David diagnosed White with an ACL sprain. Dr. David prescribed pain medication and instructed White to continue exercises.

Between July and November 2017, White visited the medical unit at least four more times complaining of left knee issues. For example, in August, White's knee "snapped out of place" and he was taken in a wheelchair to the medical unit. He saw a non-party nurse, and Dr. David ordered an X-ray. The X-ray showed that white's knee had arthritis, excess fluid around the knee, and no fractures. Dr. David performed a Lachman test, which was negative. Dr. David found no swelling, tenderness, or limitation. And on November 4, White was rolled in a wheelchair to the medical unit and saw a non-party nurse. White was unable to straighten his leg. Dr. David ordered an anti-inflammatory and another X-ray.

On November 16, Dr. David saw White again. White was unable to fully extend his leg. Dr. David submitted a second request for an MRI to Wexford's collegial review board. The board approved the request. White received the MRI two and a half years after his injury and one year, eleven months after Nurse Woods's note first mentioned that White suffered from an "unresolved ACL issue."

The MRI revealed that White had a meniscus tear and an ACL tear. Following this diagnosis, White received surgery on his left knee. White continued to have knee issues after his surgery.

### B. District Court Proceedings

### 1. *Pro Se* Complaint, Screening Disposition, and Litigation Deadlines

In February 2018, White filed a pro se complaint against Nurse Woods, Dr. David, and Wexford. When screening White's complaint pursuant to 28 U.S.C. § 1915(e)(2), the district court organized White's allegations into three counts: Count 1 – claims against Dr. David, Nurse Woods, and unnamed nurses for deliberate indifference to his knee injury in violation of the Eighth Amendment; Count 2 – a *Monell* claim against Wexford for failing to establish policies and procedures at the prison to ensure prompt medical service; and Count 3 – a claim that defendants violated the Due Process Clause by improperly handling White's medical grievances. The court dismissed Count 2 against Wexford, without prejudice, explaining that White failed to allege any policy or custom attributable to Wexford. The district court also dismissed Count 3, which is not at issue on appeal.

### 2. Post-Counsel: Summary Judgment Motions. Additional Discovery, and Motion to Amend Complaint

Two years into litigation, White obtained counsel on March 3, 2020.[3] When counsel entered an appearance, the discovery deadline was approaching in one month, and White's deadline to amend his complaint had passed in December 2018.

After discovery closed, defendants moved for summary judgment. In response, White moved to reopen discovery. At a hearing on White's motion, his counsel stated that he might want to amend the complaint to revive the *Monell* claim against Wexford and add a medical malpractice claim against Dr. David, Nurse Woods, and Wexford. The court said that it was not inclined to allow an amended complaint at that stage of the proceedings, but it nonetheless denied defendants' motion for summary judgment without prejudice and reopened discovery.

With discovery reopened, White deposed Dr. David and Nurse Woods and served an expert report from orthopedic surgeon Dr. Vincent P. Cannestra. In the expert report, Dr. Cannestra opined that White's ACL injury is the type of injury that, if not treated surgically within two to six weeks of injury, would cause major problems later in life, necessitating future treatment including pain medication, physical therapy, and knee replacement. He opined that "[w]ithout a doubt, the

---

[3] White had previously requested appointment of counsel four times, but the district court denied White's requests. White retained counsel after his release from prison. In counsel's motion for pro hac vice admission, he stated that he was "familiar with the law, facts, and procedures relating to the subject matter of this litigation."

medical records showed that an [ACL] injury was suspected as early as September 18, 2015" by the physical therapist who performed a complete physical exam on White.

Dr. Cannestra opined that Dr. David and Nurse Woods failed to complete adequate physical examinations on White and that failure "clearly led" to White's "delay[ed]" diagnosis and treatment for almost two and a half years. For example, it is Dr. Cannestra's opinion that Dr. David did not perform any physical exam on White on September 25, 2015 (nearly 13 weeks after White's injury) "given the grossly abnormal findings of the physical therapist four days earlier." He also pointed to a "stark contrast" between Dr. David's exam of normal gait in October 2017 and a non-party nurse's exam showing White's continued inability to straighten his leg fully in November 2017.

Dr. Cannestra opined that "[t]he majority of Mr. White's problems with the left knee were soft tissue in origin, particularly the bucket-handle tear of the medial meniscus and the anterior cruciate ligament tear, findings not seen on an X-ray." According to Dr. Cannestra, "Dr. David failed in his role as a physician by not pursuing an MRI scan of Mr. White's left knee at the time of his initial evaluation," given the information available to him at the time of the evaluation. He further opined that "Dr. David knew or should have known that the appropriate imaging study for Mr. White's continued complaints regarding his left knee after the first set of radiographs would have been an MRI scan and not a second, third, and fourth set of x-rays of the left knee." He explained that the utility of a fourth set of X-rays was especially unclear because there were "no essential changes" in the previous three sets of X-rays. He also opined that defendants' "failures to

order an MRI scan for [White's] acute injuries of the left knee and their excessive non-operative treatment of Mr. White's surgical injuries despite his chronic complaints of the left knee, have a direct causal connection to Mr. White's poor prognosis in the future regarding his left knee."

Dr. Cannestra highlighted that White's medical record first mentions "left knee ACL" issues in January 2016 although White complained of knee pain and discomfort, including stabbing and throbbing, from the date of his injury. Dr. Cannestra also highlighted that in 2017 a non-party nurse documented that White's knee problems started in 2015 "and since 2015 Mr. White had no improvement or relief in his knee."

Dr. Cannestra opined that White's "left knee has been irreversibly and permanently damaged" "[a]s a result of not having [his left knee] injuries surgically addressed for two years and nine months." He also opined that White's "left knee arthritis will progress farther than if he had [his] injuries identified and treated in the summer of 2015."

Six months after counsel joined the matter, White requested leave to file an amended complaint to assert state law medical malpractice claims against Dr. David, Nurse Woods, and Wexford, and to reassert a *Monell* claim against Wexford. Meanwhile, discovery again closed, and Dr. David and Nurse Woods renewed their motion for summary judgment.

The court denied White's leave-to-amend request, finding that the request was the result of undue delay without good cause and that allowing leave would prejudice defendants.

Subsequently, the district court granted defendants' motion for summary judgment. According to the court, "[t]he

crux of White's complaint is that he wanted an MRI and or-
thopedic consult much sooner than he received them." The
court highlighted that White was seen at least fifteen times for
his knee pain, was treated, showed improvement, and had a
lengthy gap between treatment of March 2016 to July 2017.
The court reasoned that "[t]he fact that White was provided
with a conservative treatment plan does not make Woods or
David deliberately indifferent, and White [] provided no evi-
dence that shows the treatment was not the product of the
professional judgment or was 'blatantly inappropriate.'" The
district court did not address White's expert report from Dr.
Cannestra.

White appeals.

## II.  Discussion

White argues that the district court erred in three ways.
First, he argues that the district court erred at screening be-
cause it should have concluded that his complaint stated a
state law negligence claim against Wexford. Second, White ar-
gues that the district court abused its discretion by denying
White leave to amend his complaint. Lastly, he argues that the
district court erred by granting summary judgment to Dr. Da-
vid and Nurse Woods. We address each argument in turn.

### A. The District Court Did Not Err By Failing To Read
White's Complaint to Include a Negligence Claim
Against Wexford

At screening, the district court dismissed Wexford from
the suit after finding that White failed to allege a plausible
*Monell* claim against Wexford. White argues that the court
should have interpreted his complaint to include a state law
negligence claim against Wexford and allowed that claim to

proceed. Defendants argue that White forfeited this argument. Alternatively, defendants argue that White failed to assert a plausible negligence claim because his allegations were conclusory. We conclude that White waived his argument that the district court failed to construe his complaint to include a negligence claim.

In White's motion for leave to file an amended complaint, he stated that he wanted to amend his complaint to "assert" a state law negligence claim (medical malpractice) as a "new legal theory." *See* Mot. Am. Compl. ¶ 15 ("The only new legal theory added in the proposed amended complaint is a state law medical malpractice claim."); *id.* ¶ 11 ("The proposed amended complaint seeks to assert state law medical malpractice claims against Woods, Dr. David, and their employer, Wexford Health Sources. … In addition, the proposed amended complaint repleads the deliberate indifference constitutional claim against Wexford that the district judge dismissed without prejudice in his merits review.") (emphasis added). White's request to assert a negligence claim as a new legal theory is an affirmative admission that the original complaint did not state a negligence claim against Wexford, and therefore, the claim was not before the district court when it dismissed Wexford was from the suit. *See Economy Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 720 (7th Cir. 2008) (citation omitted) ("[T]o reverse the district court on grounds not presented to it would undermine [its] essential function."). *Cf. United States v. Ritz*, 721 F.3d 825, 827–28 (7th Cir. 2013) (declining to consider appellant's legal theory presented for the first time on appeal where he attempted to "change his theory after losing below"). Accordingly, it was not improper for the district court not to consider the claim.

### B. The District Court Did Not Abuse Its Discretion By Rejecting White's Request To Amend His Complaint

White next challenges the district court's denial of his request for leave to amend. Reviewing the district court's denial for abuse of discretion, *see L. Offs. of David Freydin, P.C. v. Chamara*, 24 F.4th 1122, 1133 (7th Cir. 2022) (citation omitted), we conclude that the court operated within its discretion by providing reasonable explanations for rejecting White's request.

"The general rule is to freely permit plaintiffs to amend their complaint[s] once as a matter of course." *Id.* (citations omitted). "This general rule has its limits," and "[d]istrict courts 'may deny leave to amend … where there is a good reason to do so, such as futility, undue delay, prejudice, or bad faith.'" *Id.* (citations omitted). But district courts must offer a reasonable explanation for denying an amendment and not simply provide an "outright refusal." *Id.* (citation omitted); *see also Gonzalez-Koeneke v. West*, 791 F.3d 801, 808 (7th Cir. 2015) (citation omitted) ("We will not reverse a district court's decision, however, when the court provides a reasonable explanation for why it denied the proposed amendment.").

Undue delay and prejudice, together, may be sufficient reasons for denying an amendment. *See Liebhart v. SPX Corp.*, 917 F.3d 952, 965 (7th Cir. 2019) (citation omitted) ("Delay by itself is normally an insufficient reason to deny a motion for leave to amend. Delay must be coupled with some other reason. Typically, that reason … is prejudice to the non-moving party."); *see also id.* (upholding district court decision denying leave to amend when plaintiffs failed to sufficiently explain why they sought leave more than four months after they

learned of additional facts to support their claims, the parties had briefed summary judgment motions, and trial was approaching within three months).

Here, the district court offered reasonable explanations for denying White's request for leave to amend: undue delay and prejudice. The court explained that White was granted an opportunity to amend and failed to do so; White's request came two years after the deadline to amend; White's counsel requested leave to amend three months after informally telling the court that he planned to do so; and, White never gave any reason for the delayed request. The court also explained that defendants would be prejudiced because the amendment would require extensive additional discovery and defendants had already been deposed and filed two motions for summary judgment. These reasons, taken together, are sufficient to show that the district court operated within its discretion in denying White leave to amend under the circumstances here.

## C. The District Court Erred By Granting Summary Judgment To Nurse Woods And Dr. David On White's Deliberate Indifference Claims

The district court granted summary judgment to Nurse Woods and Dr. David on White's deliberate indifference claims. The court reasoned that the "crux of White's complaint is that he wanted an MRI and orthopedic consult much sooner than he received them" and White provided no evidence that the conservative treatment he received from Nurse Woods and Dr. David was not the product of their professional judgment or was "blatantly inappropriate."

We review de novo a district court's grant of summary judgment. *Pontinen v. United States Steel Corp.*, 26 F.4th 401, 405 (7th Cir. 2022) (citation omitted). We have reminded judges that "no matter how tempting it might be on summary judgment to be distracted by the sparkle of seemingly compelling facts, our assigned task is to take the facts in the light most favorable to the non-moving party." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021) (citation omitted). "On summary judgment we do not weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Id.* Instead, we have "one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.*

The Eighth Amendment prohibits "cruel and unusual punishment" and imposes a duty on prison officials to take reasonable measures to ensure that inmates receive adequate medical care. U.S. Const. amend. VIII; *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citations omitted). A prison official's "deliberate indifference" to a prisoner's "serious medical needs" violates the Eighth Amendment. *Farmer*, 511 U.S. at 835 (citation omitted). "To determine if the Eighth Amendment has been violated in the prison medical context, we perform a two-step analysis." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc) (citations omitted). First, we examine "whether a plaintiff suffered from an objectively serious medical condition." *Id.* at 728 (citations omitted). Then, we examine the prison official's "subjective state of mind" to determine whether the official acted with deliberate indifference to the prisoner's medical needs. *Id.* (citation omitted). Defendants do not contest that White suffered an objectively serious medical condition with his knee problems. So, we need only

determine whether a rational jury could conclude that Nurse Woods and Dr. David acted with deliberate indifference to those problems.

To establish that a prison official acted with deliberate indifference, "a plaintiff must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties*, 836 F.3d at 728 (citation omitted). "[M]ere negligence is not enough," and "[e]ven objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it should be known—is insufficient to make out a claim." *Id.* (citations omitted). "In the case of a claim of deliberate indifference against a medical professional, a prisoner must demonstrate that the medical professional's response was 'so inadequate that it demonstrated an absence of professional judgment.'" *Stewart*, 14 F.4th at 763 (citation omitted).

We have said that if a plaintiff "has put forth sufficient evidence to permit a reasonable jury to conclude that [the prison physician's] 'inaction substantially and unreasonably delayed necessary treatment,' then he has done enough to withstand summary judgment." *Conley v. Birch*, 796 F.3d 742, 747 (7th Cir. 2015) (citation omitted). "Several circumstances can permit a jury to reasonably infer deliberate indifference, such as denial of medical treatment altogether, delay of medical care, continued ineffective treatment, a substantial departure from accepted professional judgment, practice, or standards, ignoring an obvious risk, and refusing care because of cost." *Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022) (citing *Petties*, 836 F.3d at 729; *Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 940 (7th Cir. 2015); *Conley*, 796 F.3d at 747; *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996); *Norfleet v.*

*Webster*, 439 F.3d 392, 396 (7th Cir. 2006), *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999)).

Here, the record viewed in the light most favorable to White—particularly regarding the critical six-week period during which White's unrebutted expert explained that an ACL injury must be addressed[4]—shows that White put forth sufficient evidence to create a genuine dispute over whether Nurse Woods and Dr. David were deliberately indifferent to White's knee injury by persisting "in a course of treatment known to be ineffective," departing substantially from "accepted professional judgment, practice, or standards," and delaying medical care. *Petties*, 836 F.3d at 729–30 (citations omitted). A jury could focus, as the district court did, on the fact that White was seen at least fifteen times for his knee pain, was prescribed different medications, received several X-rays, had physical therapy, and had no treatment or recorded complaints between March 2016 and July 2017. But a jury could also reasonably conclude that Nurse Woods and Dr. David's continued conservative treatment was ineffective and delayed White from receiving adequate medical care to address his knee injury within the window that would save White a

---

[4] We have appreciated when plaintiffs provide expert evidence in support of their Eighth Amendment deliberate indifference claims. Although such evidence "is not always essential for an Eighth Amendment deliberate indifference claim based on medical treatment (or lack thereof), most such claims require us to take a peek at the physician's judgment, to ensure that he was actually exercising medical judgment and was not otherwise deliberately indifferent." *Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 520 (7th Cir. 2019). Accordingly, we are concerned that the district court never explicitly considered White's unrebutted expert report as it provides critical information that places Nurse Woods and Dr. David's conduct in context.

lifetime of recurring knee problems. Accordingly, a factual dispute precludes summary judgment on White's deliberate indifference claims against Nurse Woods and Dr. David. We address each medical professional separately.

With Nurse Woods, a jury could find that his decisions not to perform a complete examination on White and not to refer White to Dr. David, for an MRI or anything else, for nearly seven weeks were deliberately indifferent. White presented evidence that Nurse Woods failed to perform a complete physical examination[5] on White's injury when he was wheeled to the medical unit because White did not have an appointment, or at any time within six weeks of his knee injury, which Dr. Cannestra explained is the critical timeline to diagnose and treat an ACL tear. A jury could find, based on Dr. Cannestra's report, that had Nurse Woods performed a complete physical examination on White at the time of his injury or within the six weeks of his injury, Nurse Woods would have discovered White's tears sooner. After all, the physical therapist who did physically examine White twelve weeks after White's injury was able to discover White's knee condition.

Additionally, White presented unrebutted expert evidence that most of his left knee problems were soft tissue in origin, which an X-ray would not capture. In his deposition, Nurse Woods stated that the only objective way to diagnose an ACL tear or meniscus tear would have been through an

---

[5] Dr. Cannestra opined that Nurse Woods and Dr. David performed limited physical examinations on White during the relevant period because there was "no documentation of ligament testing, painful motion, or tender areas in the knee."

MRI, but "it wasn't time to do one yet" because it was not part of his plan. Indeed, he acknowledged that he did nothing in the relevant period to rule out an ACL tear at all. A jury could find that Nurse Woods's decision to stick to an unspecified plan was not the result of medical judgment. *Cf. Petties*, 836 F.3d at 729–30 (citation omitted) ("Another situation that might establish a departure from minimally competent medical judgment is where a prison official persists in a course of treatment known to be ineffective."). Further, a jury could find that given Nurse Woods's admission that he knew that White had a torn ACL no later than by January 29, 2016 (one year and eleven months before White received an MRI), Nurse Woods's failure to refer White for an MRI by then was a substantial departure from accepted professional judgment. "While nurses may generally defer to instructions given by physicians, they have an independent duty to ensure that inmates receive constitutionally adequate care." *Perez v. Fenoglio,* 792 F.3d 768, 779 (7th Cir. 2015) (citation omitted); *see also Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 485–86 (7th Cir. 2022) (citations omitted) ("Under some circumstances when a nurse is aware of an inmate's pain and the ineffectiveness of the medications, a delay in advising the attending physician or in initiating treatment may support a claim of deliberate indifference."). All of this evidence, taken together, is enough to create a triable issue of whether Nurse Woods was deliberately indifferent to White's knee injury.

For Dr. David, a jury could conclude that he unreasonably delayed necessary treatment for White's knee injury by continuing a conservative care regimen. As mentioned, according to White's unrebutted expert report, it is necessary to diagnose and treat an ACL tear within two to six weeks of injury. Dr. David did not see White until seven weeks after his injury.

But even if one begins the clock after Dr. David first saw White, a reasonable factfinder could still conclude that he failed to perform a complete examination on White within the critical period. A jury could conclude that absent this failure, Dr. David could have properly diagnosed and treated White's knee condition sooner. A jury could also agree with Dr. Cannestra's explanation that Dr. David should have requested an MRI upon his initial evaluation, instead of opting to order a second X-ray. Further, as early as September 2015, when Dr. David first requested approval for an MRI, he believed that White had a ligament tear or strain and that conservative treatment had not improved White's condition. A jury could conclude that Dr. David's failure to request another MRI for over two years and his decision to continue to treat White's knee condition conservatively was not the product of medical judgment. *See Conley*, 796 F.3d at 748–49 (leaving to the jury the question of whether a prison physician acted with deliberate indifference where the physician strongly suspected that the plaintiff's hand was fractured but failed to promptly evaluate the plaintiff's condition by ordering an x-ray or performing an in-person exam and failed to provide appropriate precautionary treatment).

Given the material disputes of facts in this case, a jury should be able to determine which "party's version of the facts is most likely to be true." *See Stewart*, 14 F.4th at 760 (citation omitted). Is it Dr. David and Nurse Woods's version that conservative treatment for White's knee injury was sufficient? Or, is it White's version that defendants' conservative treatment (instead of ordering an MRI where defendants suspected an ACL tear and White's knee frequently "popped" out of place) rose to the level of deliberate indifference? *See Conley*, 796 F.3d at 749.

### III. Conclusion

For the reasons above, we VACATE and REMAND the district court's dismissal of White's deliberate indifference claims against Nurse Woods and Dr. David for the matter to proceed to trial on those claims, and we AFFIRM in all other respects.

ST. EVE, *Circuit Judge*, dissenting in part. I join the majority in almost all respects, but I write separately to explain why I would have affirmed summary judgment as to Nurse Woods. Even when viewing the facts in the light most favorable to the nonmoving party, Nurse Woods was not deliberately indifferent to White's serious medical injury.

To show deliberate indifference, a plaintiff "must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (quoting *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc)). If "the defendant's treatment decision departed so radically from accepted professional judgment, practice, or standards," then "a jury may reasonably infer that the decision was not based on professional judgment." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 663 (7th Cir. 2016)). "But where the evidence shows that a decision was based on medical judgment, a jury may not find deliberate indifference, even if other professionals would have handled the situation differently." *Dean*, 18 F.4th at 241. In other words, medical malpractice "does not become a constitutional violation merely because the victim is a prisoner*." Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013).

We have repeatedly emphasized that "an inmate is not entitled to demand specific care." *Walker*, 940 F.3d at 965 (quoting *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011)). Courts will not second-guess medical treatment decisions "unless there is evidence that 'no minimally competent professional would have so responded under those circumstances.'"

*Walker*, 940 F.3d at 965 (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)). Of particular relevance here, we have observed that "[a]n MRI is simply a diagnostic tool, and the decision to forego diagnostic tests is 'a classic example of a matter for medical judgment.'" *Pyles*, 771 F.3d at 411 (quoting *Estelle*, 429 U.S. at 107).

The undisputed facts show that Nurse Wood's treatment plan, while conservative, did yield some improvements in White's condition. The day of White's injury, Nurse Woods prescribed an anti-inflammatory drug and ordered crutches until he could examine White in person. Nurse Woods then personally examined White three times between June 30, 2015, and August 11, 2015. During the August 11 appointment, Nurse Woods performed a "drawer test" to look for excessive laxity of White's ACL. The test was negative, but Nurse Woods nonetheless referred White to Dr. David. White then had multiple follow-up appointments with Dr. David and participated in physical therapy. White did not see Nurse Woods again until January 29, 2016, when Nurse Woods prescribed anti-inflammatory medication. White complained of knee pain but admitted that he was not following his physical therapy regimen, he could walk, and there was no swelling in his knee. After January 29, Nurse Woods had no further involvement in White's treatment.

In light of the foregoing, no reasonable jury could conclude that Nurse Woods acted with deliberate indifference to White's serious medical condition. Nurse Woods did not inexplicably delay White's treatment, nor did he persist in an ineffective course of treatment. He prescribed medication, ordered crutches, examined White's knee, and referred White to a doctor back in August of 2015. *See Reck v. Wexford Health*

*Sources, Inc.*, 27 F.4th 473, 486 (7th Cir. 2022) (nurse was not deliberately indifferent to inmate's burst abscesses, even though she did not physically examine the plaintiff or consult a physician, because the evidence supported negligence at most); *Brown v. Osmundson*, 38 F.4th 545, 553 (7th Cir. 2022) (nurse practitioner was not deliberately indifferent where she "acted promptly, prescribing medication to alleviate [the plaintiff's] pain," and a doctor was simultaneously treating the plaintiff). To be sure, Nurse Woods stated at his deposition that "the only objective way to diagnose [the injury] would be to have me put him on an MRI machine," and he did not ask Dr. David to order one. But Nurse Woods made that statement with the benefit of hindsight after White brought this suit. The fact that Nurse Woods did not recommend an MRI sooner does not mean that he persisted in an ineffective course of treatment, or that "no minimally competent professional would have so responded under those circumstances." *Pyles*, 771 F.3d at 409.

Because I would affirm summary judgment as to Nurse Woods, I respectfully dissent.